Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.



United States Courts
Southern District of Texas
FILED

AUG 06 2018

David J. Bradley, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**18 CV 2703**

| | |
|---|---|
| United States of America, and the State of Texas, *ex rel.* [UNDER SEAL], | Case No.: _____ |
| | |
| Relator, | **ORIGINAL COMPLAINT FOR:** Violations of False Claims Act, 31 U.S.C. § 3729 *et seq.*, and Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001, *et seq.* |
| v. | |
| [UNDER SEAL], | |
| Defendant. | **FILED _IN CAMERA_ AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2) (EXEMPT FROM ECF)** |
| | |
| | **JURY TRIAL DEMANDED** |

Sealed

Public and unofficial staff access
to this instrument are
prohibited by court order.

AUG 0 6 2018

David J. Bradley, Clerk of Court

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| United States of America, and the State of Texas, *ex rel.* Ana Abreu,<br><br>                Relator,<br>v.<br><br>Aveanna Healthcare AS, LLC, a/k/a Aveanna Healthcare, LLC,<br><br>                Defendant. | Case No.: _____<br><br>**ORIGINAL COMPLAINT FOR: Violations of False Claims Act, 31 U.S.C. § 3729 *et seq.*, and Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001, *et seq.***<br><br>**FILED <u>IN CAMERA</u> AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

## RELATOR'S ORIGINAL COMPLAINT

Relator, Ana Abreu, through her attorneys and on behalf of the United States of America and the State of Texas, hereby files this Original Complaint against Aveanna Healthcare AS, LLC, a/k/a Aveanna Healthcare, LLC ("Aveanna" or "Defendant"), formerly known as Option 1 Nutrition Solutions, LLC, d/b/a Epic Medical Solutions, and Epic Health Services. Relator alleges as follows:

## I.      INTRODUCTION

1.      Relator, Ana Abreu brings this *qui tam* action pursuant to the federal False Claims Act and the Texas Medicaid Fraud Prevention Act. This action concerns false and fraudulent statements, reports and claims for payment that Defendant routinely and intentionally submitted to federal and Texas government programs, including Medicare, Medicaid, TRICARE, and various Medicare Advantage Organizations ("MAOs"), and Managed Care Organizations ("MCOs") (hereinafter, the "Government"). Upon information and belief, Defendant had

1

customers covered by each of these programs and submitted fraudulent bills to each of these programs.

2.      Defendant is liable under the False Claims Act ("FCA", 31 U.S.C. §§ 3729 *et seq.*), and the Texas Medicaid Fraud Prevention Act ("TMFPA", Tex. Hum. Res. Code §§36.001 *et seq.*), due to Defendant's conduct in submitting false and fraudulent records, statements, and claims for payment to Government-funded healthcare Programs.

3.      Relator also seeks damages for herself as a result of Defendant's retaliation against Relator in violation of the anti-retaliation provisions of the FCA, 31 U.S.C. §§ 3730(h), and TMFPA, TEX. HUM. RES. CODE §36.115.

## II.      THE PARTIES

4.      Relator, Ana Abreu, is a citizen of Texas, residing in Houston, Harris County, Texas.

5.      Aveanna Healthcare AS, LLC ("Aveanna"), is the largest pediatric home healthcare company in the United States. It is a Georgia limited liability company headquartered at Six Concourse Parkway, Ste. 1100, Atlanta, Georgia 30328, and is registered to do business in Texas. Its address in Texas is 13505 Round Up Lane, Suite 100, Houston, TX 77064. Its Texas registered agent for service is Corporation Service Company d/b/a/ CSC-Lawyers Incorporating Service Company, 211 E 7th Street, Suite 620, Austin, Travis County, Texas 78701. At all times relevant to the events described in this Complaint, Aveanna (and its predecessor corporations) were engaged in the business of providing medical equipment, products and supplies to individuals who were covered by Medicare, Medicaid, or other Government-supported healthcare programs. Its manager is Aveanna Healthcare LLC, a Georgia corporation with the same address.

2

6.     Aveanna is liable as the successor of companies that were absorbed by Aveanna by merger and purchase, including Medco Medical Supply; Option 1 Nutrition Solutions, LLC; Epic Medical Solutions; and Epic Health Services.

7.     Option 1 Nutrition Solutions, LLC is an Arizona corporation. It operated under the names Epic Medical Solutions and Epic Health Services ("Epic"). Its mailing address was 2460 East Germann Road, Suite 18, Chandler, Arizona, 85286. In or around March 2017, Epic merged with PSA Healthcare to form Aveanna, headquartered in Atlanta, Georgia.

8.     Prior to becoming Aveanna, Epic bought out a company called Medco Medical Supply ("Medco") in 2015.

9.     Relator worked continuously from 2008 through 2018 for the same company, although the name changed twice. Her employer was originally Medco, then became Epic Medical Solutions when it acquired Medco in 2015, then became Aveanna after the 2017 merger.

10.     The United States is named as a Plaintiff herein pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly paid to Defendant, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendant made or caused to be made.

11.     The State of Texas is herein named as a Plaintiff pursuant to the Texas Medicare Fraud Prevention Act, Tex. Hum. Res. Code §§36.001, et seq., as funds of the State of Texas have been directly or indirectly paid to Defendant, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendant made or caused to be made.

### III.    JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendant because the Defendant can be found in, resides in, and/or has transacted business within this Court's jurisdiction, and some of the acts giving rise to Relator's claims occurred within this district.

14.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because the Defendant resides in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district.

15.     Relator has direct and independent knowledge of the alleged fraud and disclosed this information to the government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B). Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary.  However, in the event there has been a public disclosure, Relator made a pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2).  Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing a complaint.

16.     Relator is familiar with Defendant's fraudulent billing practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

4

## IV.    THE FALSE CLAIMS ACT

17.    The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability for an individual or entity that: "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(l)(A); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, *id.* § 3729(a)(l)(B).

18.    For purposes of the False Claims Act, "knowing" and "knowingly" (A) mean that a person, with respect to information-- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1).

19.    In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.[1]

20.    The FCA also provides for payment of a percentage of the United States' recovery to a private individual (the "Relator") who brings suit on behalf of the United States under the FCA. *See* 31 U.S.C. § 3730(d).

---

[1] FCA civil penalties are $5,500 to $11,000 for violations occurring on or after September 29, 1999 and before January 1, 2016, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes) and 64 Fed. Reg. 47099, 47103 (1999). Penalties for violations occurring after January 1, 2016 and before January 1, 2017, are $10,781 to $21,563. Penalties for violations occurring after January 1, 2017 are $10,957 to $21,916.

## V.    TEXAS MEDICAID FRAUD PREVENTION ACT

21.    The Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code Ann. §§ 36.001 *et seq*., allows private citizens with knowledge of Texas Medicaid Fraud to file a claim on behalf of the State.

22.    Under the TMFPA, a person commits an unlawful act if the person knowingly makes or causes to be made a false statement or misrepresentation of a material fact to receive a Medicaid payment; knowingly conceals or fails to disclose information that permits a person to receive a Medicaid payment; knowingly makes or causes to be made a Medicaid claim for a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner, a service or product that is substantially inadequate or inappropriate or a product that has been adulterated, debased or mislabeled; knowingly obstructs an investigation by the attorney general of an alleged unlawful act; or knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to make a payment to Texas, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to make a payment to Texas under the Medicaid program.

23.    A person acts "knowingly" with respect to information if the person: has knowledge of the information; acts with conscious indifference to the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information.

24.    Proof of the person's specific intent to commit an unlawful act under the TMFPA is not required to show that a person acted "knowingly."

25.    A person who commits an unlawful act under the TMFPA is liable to the State for the amount of any payment or benefit provided under the Medicaid program as a result of the unlawful act, interest on the amount of the payment or benefit, a civil penalty of between $5,500

6

and $11,000 for each unlawful act (as adjusted pursuant to law) plus two times the amount of the payment or benefit.

## VI.    MEDICARE AND TRICARE

26.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

27.    The Medicare Program is comprised of four parts. Medicare Part B (Medical Insurance) covers medically necessary durable medical equipment (DME) prescribed by a doctor for use in a patient's home. DME must be durable (can withstand repeated use); used for a medical reason; not usually useful to someone who isn't sick or injured; used in the home, with an expected lifetime of at least 3 years. Medicare Part B also covers enteral nutrition supplies and equipment.

28.    The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through CMS. CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as "fiscal intermediaries" (hereinafter "MACs") to review, approve, and pay Medicare bills, called "claims," received from health care providers, such as Defendant's providers. In this capacity, the MACs act on behalf of CMS.

29.    Payments are typically made directly to health care providers, such as Defendant's providers, rather than to the patient. This occurs when the Medicare recipient assigns his or her right to payment to the provider, such as Defendant's providers. In that case, the provider submits its bill directly to Medicare for payment.

30.    In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form. When the CMS-1500 form is submitted, the

7

provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

31.     On the CMS-1500 form, the provider must state, among other things, the procedure(s) for which it is billing Medicare, the identity of the patient, the provider number, and a brief narrative explaining the diagnosis and the medical necessity of the services rendered.

32.     All healthcare providers, including Defendant's providers, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part A.

33.     A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following: (a) Medicare reimburses only reasonable and necessary medical services furnished to beneficiaries. See 42 U.S.C. § 1395y(a)(1)(A); and (b) Providers must assure that they provide economical medical services, and then, only when, and to the extent, medically necessary. See 42 U.S.C. § 1320c-5(a)(1).

34.     Medicare regulations exclude from payment services that are not reasonable and necessary. See 42 C.F.R. § 411.15(k).

35.     Because it would not be feasible to review medical documentation before paying each claim, the MACs generally make payment on the basis of the providers' certification on the Medicare claim form that the services in question were "medically indicated and necessary for the health of the patient." The claims are paid from the Medicare Trust Funds, funded by American taxpayers.

36.     TRICARE, formerly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), is the U.S. Department of Defense Military Health System's health care program, which provides civilian health benefits for U.S Armed Forces military

8

personnel, military retirees, and their dependents and is managed by the U.S. Defense Health Agency.

## VII.   TEXAS MEDICAID

37.     The Medical Assistance Program in Texas, commonly referred to as "Texas Medicaid", is jointly funded by the Federal government and Texas and was created to provide medical care and other benefits for poor and disabled individuals and families in Texas who otherwise could not afford them.

38.     Texas Medicaid provides health care to more than 4.1 million low-income, disabled and elderly Texas residents at a cost of more than $20 billion. The Texas Health and Human Services Commission ("HHSC") administers Texas Medicaid in partnership with participating physicians, hospitals, and pharmacies.

39.     Texas Medicaid covers the costs of DME and enteral supplies. *See* Texas Medicaid Provider Procedures Manual, Durable Medical Equipment, Medical Supplies and Nutritional Products Handbook (July 2018), Chapters 2.2.2 - DME and Supplies; 2.2.3 - Medical Supplies; and 2.2.17 - Nutritional (Enteral) Products, Supplies and Equipment.

40.     Healthcare providers may elect to participate in the Texas Medicaid program. To become a Texas Medicaid Provider, a healthcare provider must submit a Provider Enrollment Application and enter into a Medicaid Provider Agreement with HHSC ("Provider Agreement"). As a condition for participating in Texas Medicaid, a provider must represent to Texas Medicaid that they will comply with all of the requirements of the Texas Medicaid Provider Procedures Manual ("Provider Manual"). Providers must further acknowledge their duties to be familiar with the Provider Manual and to ensure that employees acting on behalf of the providers also comply with the requirements set forth in the Provider Manual.

41.     Providers further agree under the Provider Agreement that they will comply with applicable state and federal laws governing and regulating Medicaid, and all state and federal laws and regulations related to waste, abuse, and fraud. Medicaid Providers also agree that all services billed to Texas Medicaid must be medically necessary and performed or provided within accepted medical community standards required by statute or regulation, including statutes and standards that govern occupations.

42.     When approving a healthcare provider to become a Texas Medicaid Provider, Texas Medicaid must rely upon the representations of the provider that he or she will comply with all of the terms and conditions of the Provider Agreement and the Provider Manual. Accordingly, Texas Medicaid Providers have an on-going duty to Texas Medicaid to comply with these terms and conditions and comply with state and federal laws when providing medical services and treatment to Texas Medicaid patients.

43.     The Provider Manual expressly sets forth, inter alia, the following requirements of Texas Medicaid Providers, including Defendant:

• When receiving Medicaid funds Medicaid Providers cannot falsify or conceal material facts related to the payment;

• Medicaid Providers cannot omit pertinent facts when claiming payment from Texas Medicaid;

• Medicaid Providers cannot omit pertinent facts to obtain greater compensation than that to which the provider is legally entitled;

• Medicaid Providers cannot fail to provide quality services to Medicaid patients within accepted medical community standards or standards required by statute or regulation.

44.     Additionally, each time Texas Medicaid Providers make a claim for payment, they certify and represent to Texas Medicaid as a part of the claim submission, that the information they are submitting is true, accurate and complete, and that the services identified

10

were medically indicated and necessary.

45.     When submitting their claims, Texas Medicaid Providers further certify and expressly acknowledge their continuing duties to Texas Medicaid to comply with the terms and conditions of the Provider Agreement and Provider Manual, to comply with state and federal law, and to not make false claims or conceal material facts related to the medical service for which they are seeking payment.

46.     With thousands of medical services and procedures billed every day by Medicaid Providers, Texas Medicaid has neither the personnel nor the resources to ensure that Medicaid Providers have complied with all requirements of the Provider Agreement and the Provider Manual at the time they perform the medical service or procedure or when they submit a claim to Texas Medicaid for payment. Rather, Texas Medicaid must rely upon the affirmative representations as well as the honesty and good faith of Medicaid Providers that they are complying with the Provider Agreement and Provider Manual; are following state and federal laws; and are providing services, equipment and products that are medically necessary and appropriate as certified by a physician or other approved person.

47.     The Omnibus Budget Reconciliation Act (OBRA) of 1989 mandated the expansion of the federal EPSDT program (Early and Periodic Screening, Diagnostic and Treatment child health component of Medicaid program) to include any service that is medically necessary and for which federal financial participation (FFP) is available, regardless of the limitations of Texas Medicaid. This expansion is referred to as the Comprehensive Care Program (abbreviated as CCP). CCP services are provided only for clients 20 years of age and younger who are eligible to receive THSteps (Texas Health Steps) services.

11

48.     Defendant was an approved CCP provider and had to follow the same general rules and regulations when receiving CCP funds as when receiving Texas Medicaid funds.

### VIII.   MAOs and MCOs

49.     Defendant's fraud on Medicare Advantage Organizations ("MAOs"), and Managed Care Organizations ("MCOs") constitute fraud on the Government because it results in the Government increasing its payments to them.

50.     CMS reimburses MAOs with monthly capitated payments that are periodically adjusted upward or downward depending on the severity of healthcare issues that their members typically face, i.e., Risk Adjustment Factors ("RAFs"). The use of RAFs allows CMS to pay MAOs for the risk of the category of beneficiaries they enroll. By doing so, CMS should be able to make appropriate and accurate payments for enrollees with differences in expected healthcare costs. The use of RAFs also allows CMS to use standardized bids as base payments to Medicare Advantage plans.

51.     MAOs regularly submit risk adjustment information and data concerning their members (such as age, gender, healthcare diagnoses and medical treatments) to CMS to affect the amount of the monthly capitated payments they receive. Such information is reported in the form of MA risk scores ("Risk Scores"). Generally, the less healthy an MAO's plan members are reported to be as a group, that is, the higher their composite MA Risk Scores, the more money the MAO receives from CMS. CMS calculates such risk-adjusted payments pursuant to certain actuarial principles underlying what is known as the Hierarchical Condition Category ("HCC") Model.

52.     MAOs submit MA Risk Score data to CMS on a form known as a Risk Adjustment Payment System ("RAPS") report. The forms are typically submitted monthly.

12

53.     The enabling laws governing CMS' administration of MA Program payments, including its risk scoring and adjustment methodology, are found in Section 1853 of the Social Security Act [42 U.S.C. § 1395w-23].

54.     The administrative agency rules for determining and adjusting MA payments from CMS are codified at 42 CFR Part 422, Subpart G, §§ 422.300 to 422.324.

55.     The MA Program policies and practices that CMS conveys to all MAOs are set out principally in CMS' published Medicare Managed Care Manual. Chapter 7 of the manual instructs MAOs on how to properly implement CMS' HCC rate adjustment methodology and Chapter 8 tells MAOs what steps need to be followed in order to lawfully receive MA Program payments.

56.     In general, CMS' risk adjustment methodology relies heavily on enrollee healthcare diagnoses, as specified by the International Classification of Disease ("ICD Codes") guidelines, to prospectively adjust capitation payments for specific members based on their health status.

57.     MAOs, are required to review their members' medical records and submit their members' ICD Codes to CMS monthly to develop the HCC risk scores that are used to adjust the monthly capitated reimbursements paid by CMS to that MAO.

58.     CMS also uses RAPS data to reassess its risk assessment level and capitation rates for each enrollee for the following Medicare Advantage Plan year. RAPS submitted in one plan year will therefore affect the amount of capitated payments for corresponding enrollees in subsequent plan years.

59.     Since CMS relies exclusively on the MAOs' reporting of their members' ICD Codes in RAPS to determine MA Program reimbursement amounts, MAOs are charged with

13

ensuring the accuracy of such reports. CMS has repeatedly made MAOs aware of this obligation in various public pronouncements, including CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide at p.13. ("Accurate risk-adjusted payments rely on the diagnosis coding derived from the member's medical record.")

60.     Accordingly, when a healthcare provider, like Defendant, falsely bills an MAO, it results in increased RAPS scores, which indirectly results in the Government paying more money to that MAO, because the MAO communicates to CMS that its members are sicker and in need of more costly healthcare services than is actually the case.

## IX.     THE RELATOR

61.     Relator, was hired by Defendant's predecessor company, Medco, in 2008.

62.     Her employer became Epic Medical Solutions when it acquired Medco in 2015. Her employer became Aveanna when Epic merged with another company to become Aveanna in 2017.

63.     Relator worked continuously from 2008 through 2018 for the same company, although the name changed twice.

64.     Shortly after Epic's 2015 purchase of Medco, Relator began to witness the wrongdoing described below in this Complaint. She made good faith efforts to educate her co-workers and supervisors about the applicable regulations and encourage Defendant to comply, but her efforts were constantly rebuffed.

65.     She was terminated in May 2018 in retaliation for opposing Defendant's fraudulent practices.

## X.     THE DEFENDANT

66.     Defendant, Aveanna is the result of multiple mergers and takeovers and,

14

according to its website, www.aveanna.com, is now the largest provider of pediatric home care in the United States, offering services, supplies and equipment associated with pediatric skilled nursing, pediatric therapy, autism services, enteral nutrition, therapy and adult services.

67.   Aveanna is liable for the violations of the companies it has acquired through purchase and merger, including Medco, Epic Medical Solutions and Epic Health Services.

68.   Relator has knowledge of fraud committed by Epic and Aveanna.

69.   Although Relator was employed at the Houston location of Medco, Epic and Aveanna, she has knowledge of fraud committed throughout the entire company.

70.   Defendant, as the largest provider of pediatric home care in the United States, has substantial revenue. For example, in February 2018 its revenues from Texas alone were $8,394,560 for 19,082 customers.

71.   A substantial percentage of these customers were covered by Medicaid or other Government-funded healthcare program, and a substantial portion of Defendant's revenue came from Government funds, i.e., U.S. and Texas taxpayers.

## XI.   THE SUBMISSION OF FALSE CLAIMS

72.   From the first seven years Relator worked for Medco (from 2008 to 2015), Medco operated ethically.

73.   In 2015, Epic bought Medco and introduced fraudulent billing in order to increase its profits. Epic was headquartered in Chandler, Arizona.

74.   From 2015 through 2018, Defendant knowingly submitted or caused the submission of false claims to the Government and created false records and statements to receive reimbursement from the Government for its products and services.

75. Defendant used a business management software system called Brightree for managing its billing. Relator and her co-workers were pressured to input false information into the Brightree system to permit Defendant to fraudulently bill the Government.

76. Although Relator and one of her co-workers, Yadira Acuna ("Acuna"), refused to input fraudulent information, her other co-workers routinely did so, following orders of their supervisors, resulting in false and fraudulent claims being submitted by Defendant to the Government. Additionally, when Defendant and Acuna refused to input fraudulent information, her supervisors in Arizona agreed to, and did in fact, input the fraudulent information on their accounts.

77. The Brightree system, which included the false information input by Relator's co-workers, was used to submit false claims to the Government. A review of Defendant's electronic patient files in its Brightree should have evidence of the fraud because it should include scanned copies of the doctors' prescriptions and other forms of Certificates of Medical Necessity (CMNs) with missing information, expired prescriptions and CMNs, and prescriptions and CMNs for smaller amounts than were billed. The files will also include the fabricated data input by Defendant's employees that does not match the prescriptions and CMNs.

78. On a monthly basis, Defendant's customers could switch from Medicaid to a Medicaid Managed Care plan, or vice versa. During the end of Relator's employment with Defendant, many were switching from back to Medicaid from a Managed Care plan. Defendant's employees were busy making the necessary adjustments to account for their customers becoming Medicaid patients again, including generating the proper Medicaid forms that needed to be signed by physicians. Defendant did not want to slow down the process and accordingly instructed all of its employees to fill in information on the form, even though it was required to

16

be filled in by a physician.

79. The patient files within Defendant's Brightree system include a field that identifies the payor for each customer. Supervisors and managers (but not Team Leads, like Relator) had the ability to search the Brightree system by payor, so they could search for all patients insured by Medicaid, Medicare, TRICARE, an MCO, an MAO, or other Government program.

80. Relator repeatedly complained to management about these fraudulent practices. Relator's co-worker, Yadira Acuna, voiced similar complaints.

81. Relator complained about the fraud to multiple supervisors within Defendant including: (1) Tiffaney Allen, Patient Access Supervisor, who was hired to be supervisor of the Houston office; (2) Sarah Samz, Patient Access Manager at Defendant's headquarters in Chandler, Arizona; (3) Jennifer Hannosh, Patient Access Lead East at Defendant's office in Dallas, Texas; (4) Linda Trielstad, VP of Revenue Management at Defendant's headquarters in Chandler, Arizona; and (5) Crystal Thudium, in the HR Department at Defendant's headquarters in Chandler, Arizona.

82. Relator also filed a formal complaint about Defendant's fraudulent activity with the Texas Auditor's Office on March 30, 2018.

83. Before Tiffaney Allen was hired, the supervisor of the Houston office was Jennifer Hannosh in Dallas.

84. Hannosh documented some of Relator's complaints about Defendant's fraud. For example on 10/23/2017, Hannosh sent Relator a confirming email (with a copy to Samz) stating, in part, "You [Relator, Abreu] do not feel comfortable adding Dx [diagnostic] codes if they are not on a RX [prescription] and in the clinicals and they do not feel comfortable answering the

questions on the renewal because what if they have changed from Tube to oral. You do not know how this is legal and do not want to be held accountable." (Document F2.) Hannosh's response was: "This was approved by compliance—will look into this for you." Hannosh never responded with any documents confirming that this practice was acceptable to Medicaid or other Government payors.

85.     Later that same day, Hannosh sent another email, this time to Abreu, Shawn Monette, Supriya Sharma, and Adebola Kehinde, repeating Abreu's concerns above and adding: "They do not know how this is legal and do not want to be held accountable. They will not be doing this until they have something in writing from the company stating that they will not be condoning fraud and if an audit comes they will not be fined personally because they cannot afford lawyers."

86.     Rather than providing the requested written assurance that these acts were not fraudulent, Hannosh's responses to these concerns stated: "If you or anyone on the team find they are not comfortable completing – they can just send it to Myself or Sarah [Samz] (or the certified coders here in the Chandler office) and we will do it."

87.     In other words, Relator and a co-worker in Houston expressed their concerns that they were being told to commit fraud on Medicaid, and asked for assurances that these tasks were legal. Defendant's management in Arizona responded, not by providing any assurances that the tasks were legal, but rather told Abreu and her co-workers in Houston that if they thought these tasks were illegal, they could just sent the forms to Arizona and their supervisors in Arizona would commit the fraudulent acts.

18

**A.**     **Forms Submitted by Defendant to Obtain Payment from Government Programs**

88.     CMS (Centers for Medicare and Medicaid Services) requires some form of Certificate of Medical Necessity (abbreviated as CMN) to substantiate the medical necessity of durable medical equipment furnished to Medicare and Medicaid beneficiaries. A CMN functions like a prescription and must be signed by a physician to certify that the item is medically necessary.

89.     The forms used by Defendant as CMNs to file claims with the Government included the CCP PAR form, the Texas Medicaid Title XIX form, and a standard doctor's prescription.

90.     The CCP PAR form is the Comprehensive Care Program's Prior Authorization Requests (abbreviated by Defendant as "PAR"s), where Section D is the Diagnosis and Medical Necessity field, which must be completed by a physician.

91.     The Texas Medicaid Title 19 form (typically referred to with Roman numerals as Title XIX) is the Texas Medicaid Title XIX Home Health Durable Medical Equipment (DME)/Medical Supplies Physician Order Form. Defendant often abbreviated this form as "T19" or "TXIX."

92.     A physician must certify that he/she is the physician identified in the form; that he/she has reviewed the entire form, including charges for items ordered; that the medical necessity information in Section B of he form is true, accurate and complete, to the best of his/her knowledge; and that any falsification, omission, or concealment of material fact in that section may subject him/her to civil or criminal liability.

93.     The instructions and regulations for the CCP-PAR and T19 forms provide that a supplier (like Defendant) may complete portions of the forms, but that a **physician (or the**

**physician's employee or a clinician)** must complete the sections of the CCP-PAR form listing the diagnosis and medical necessity of requested services; and the section of the T19 form listing "Section B: Diagnosis and Medical Need Information." The T19 form specifically states, in **bold**, <u>underlined</u> and *italics*: "***This is a prescription for DME/supplies and must be filled out by the prescribing physician***."

94.     The CCP-PAR Form and the T19 Form include the following certification:

I certify and affirm that I am either the Provider, or have been specifically authorized by the Provider (hereinafter "Prior Authorization Request Submitter") to submit this prior authorization request.

The Provider and Prior Authorization Request Submitter certify and affirm under penalty of perjury that they are personally acquainted with the information supplied on the prior authorization form and any attachments or accompanying information, and that it constitutes true, correct, complete and accurate information; does not contain any misrepresentations; and does not fail to include any information that might be deemed relevant or pertinent to the decision on which a prior authorization for payment would be made.

The Provider and Prior Authorization Request Submitter certify and affirm under penalty of perjury that the information supplied on the prior authorization form and any attachments or accompanying information was made by a person with knowledge of the act, event, condition, opinion, or diagnosis recorded; is kept in the ordinary course of business of the Provider; is the original or an exact duplicate of the original; and is maintained in the individual patient's medical record in accordance with the Texas Medicaid Provider Procedures Manual (TMPPM).

The Provider and Prior Authorization Request Submitter certify and affirm that they understand and agree that prior authorization is a condition of reimbursement and is not a guarantee of payment.

The Provider and Prior Authorization Request Submitter understand that payment of claims related to this prior authorization will be from Federal and State funds, and that any false claims, statements or documents, concealment of a material fact, or omitting relevant or pertinent information may constitute fraud and may be prosecuted under applicable federal and/or State laws. The Provider and Prior Authorization Request Submitter understand and agree that failure to provide true and accurate information, omit information, or provide notice of changes to the information previously provided may result in termination of the provider's Medicaid enrollment and/or personal exclusion from Texas Medicaid.

The Provider and Prior Authorization Request Submitter certify, affirm and agree that by checking "We Agree" that they have read and understand the Prior Authorization Agreement requirements as stated in the relevant Texas Medicaid Provider Procedures Manual and they agree and consent to the Certification above and to the Texas Medicaid & Healthcare Partnership (TMHP) Terms and Conditions.

**B.     Defendant fabricated Certificates of Medical Necessity**

95.     Defendant frequently lacked valid CCP-PAR and T19 forms for the products they supplied to Medicaid and CCP patients but did not want to slow down sales by having to wait for a physician to properly complete their portions of these forms for Defendant's customers. Accordingly, Defendant instructed its employees to fill in the missing information rather than incur the delay involved in following Medicaid regulations and having the physician complete their sections of the forms.

96.     Relator and Acuna resisted these efforts, informing their supervisors, that this was fraudulent conduct and that they could not participate in it. They asked for proof that this was allowed. Such proof was never provided.

97.     As one example, Defendant submitted a claim was for **Patient 1** for Enteral Supplies, Enteral Infusion Pump and other Enteral Supplies and an IV pole.

98.     TMHP (Texas Medicaid & Healthcare Partnership) wrote Defendant on March 15, 2018, specifically informing Defendant that Defendant's claim for **Patient 1** could not be approved because of missing information and informing Defendant that *it must have the physician complete the missing information in Sections D and F of the PAR form*.

99.     Adebola B. Kehinde, MHA, was a Patient Access Representative employed by Defendant in Houston. Kehinde emailed Sarah Samz, Patient Access Manager at Defendant's headquarters in Chandler, Arizona on March 20, 2018, to inform her that Texas Medicaid had placed a hold on the claim for **Patient 1** because Section D and F were missing. (Document E-2).

21

100.    Samz instructed Kehinde to try filling out Sections D and F herself and submitting it to TMHP with clinical notes. (Document E-1.) This was a clear violation of applicable rules and Defendant's sworn representations, as explained above, which required that the physician complete these sections.

101.    Although Defendant knew that it *must have the physician complete Sections D and F* of the CCP-PAR form, and was expressly told this by TMHP in its March 15, 2018 letter (Document E3, discussed above), Defendant's supervisors routinely instructed its employees to fill out these sections of the form, rather than have a physician fill them out.

102.    In fact, immediately after receiving the March 15, 2018 letter, Sarah Samz sent a March 22, 2018 email (Document F8) to all Texas employees instructing them: **"We will need to fill out the CCP form entirely, including section D and F."** This was a clear, express instruction to violate Medicaid rules, which required the physician to complete these forms, and was intentional because Defendant had just been warned a few days earlier about this exact issue. Relator's co-workers followed these instructions and as a result Defendant knowingly submitted fraudulent claims to the Government.

C.    **Defendant billed for the maximum amounts allowed, rather than the amounts prescribed.**

103.    Defendant routinely billed the Government for the maximum amount of products permitted by the Government, rather than the amount prescribed as necessary by a physician.

104.    For example, **Patient 2,** Account No. 71950, was Defendant's customer whose file included paperwork approving 40 units per month. Rather than ship and bill for the amount approved in Defendant's paperwork, Defendant shipped and billed the Government for 183 units per month in or around April 2018.

22

105.    Another example is **Patient 3**, Account No. 58935. Defendant supplied him with Pediasure beyond the amount listed on the patient's prescription, and billed the Government for the amount beyond what was prescribed. Relator and others called this to the attention of their supervisors.

106.    On 3/16/2018, Relator had an email exchange with Katarina Yanko about Defendant shipping, and billing for, quantities of product higher than prescribed to **Patient 3**. Relator explained that it was improper to bill for more than the prescribed amount. Ms. Yanko told Realtor that her supervisor was aware of this policy and approved it. Yanko emailed: "PAR is approved for increase with Superior without re-sending this to the doctor . . ." When Blanca Lopez responded on March 26, 2018 and April 2, 2018, that she shipped only the allowable amount based on the paperwork on file, Yanko responded, "I discussed previously with my supervisor and since PAR is approved for 217 units/month, no new PPW [paperwork] needed. OK to ship."

### D.    Defendant billed for products and services without a valid prescription, CMN or PAR, and fabricated information to cover up the fraud.

107.    Defendant was restricted to billing for products and equipment for patients who had a valid prescription, CMN or PAR.

108.    Defendant has a policy that whenever it lacked a valid prescription for a product, its employees had to fabricate or forge the prescription to ensure that Defendant could ship and bill for the product.

109.    For example, if a prescription was invalid due to a missing ICD-10 code, Defendant instructed Relator and other employees to fill in the missing information using old chart notes. When Relator and others protested that this was illegal and unethical, Defendant instructed Relator and others that personnel at the Arizona headquarters were willing to fabricate

the records and to have them do it. Relator's co-workers routinely followed their supervisor's instructions and fabricated this information resulting in the filing of false claims to the Government.

110.   For example, **Patient 4** is Patient ID 46076.

111.   Defendant supplied and billed the Government for products for **Patient 4** despite having an expired PAR. Samz suggested trying to submit the expired PAR to see if the Government would notice.

**E.     Defendant billed with a 31-day Cycle Instead of a 30-day Cycle.**

112.   Medicaid approved a 30-day cycle for many of the products Defendant supplied. For example, if a customer had a prescription for 3 cans of formula per day, Defendant could bill Medicaid for 90 cans per month (3 cans per day, multiplied by 30 days.)

113.   Defendant instructed its employees to bill on a 31-day cycle instead of a 30-day cycle. Relator and one of her co-workers complained to their supervisor that Medicaid would not permit billing in this manner. When Defendant assured Relator and her co-worker that this form of billing was permissible, Relator and her co-worker asked for proof. No proof was ever provided. Defendant continued billing in this manner.

114.   **Patient 5**, Patient ID 45779, was billed in this manner.

**F.     Additional Examples of Defendant's customers for whom Government was Overbilled**

115.   **Patient 6 is Patient ID #42046.** Defendant billed for shipping her formula despite having no valid doctor's prescription on file. The doctor refused to prescribe the formula without seeing the patient. Defendant shipped and billed it anyway.

116.   **Patient 7 is Patient ID #73531.** Defendant billed for 93 units per month despite

only having authority for 90 per month.

117.    **Patient 8 is Patient ID #37584.** Defendant billed for 240 diapers per month despite only having authority for 180 per month.

118.    **Patient 9 is Patient ID #51999.** Defendant shipped and billed for product despite authorization being denied.

119.    **Patient 10 is Patient ID #72130.** Defendant shipped and billed for 240 diapers per month despite only having authority for 180 per month.

120.    **Patient 11 is Patient ID #40047.** Defendant shipped and billed for 120 diapers per month despite only having authority for changes once per day.

121.    **Patient 12 is Patient ID #43435.** Defendant shipped and billed for 234 diapers per month despite only having authority for changes twice per day.

122.    **Patient 13 is Patient ID #72916.** Defendant had a November 2017 prescription with no refill or length of need. Defendant shipped and billed product based on the prescription for 6 months.

123.    **Patient 14 is Patient ID #47509.** Defendant shipped and billed using paperwork for a different patient, with a different date of birth, beginning May 2017 and going forward.

## XII.    RETALIATION

124.    Before Relator began opposing Defendant's fraud, she was recognized as an exemplary employee. Defendant promoted her, gave her additional responsibilities, and consistently praised her performance

125.    On April 3, 2018, Relator's supervisor Tiffaney Allen drafted a One on One Shadowing form documenting that Relator is very knowledgeable about the system, toggles in

25

and out with ease, and ensures all tasks are worked. She was described as a very fast worker, and able to quickly identify what was needed on the account.

126.   On May 8, 2018, Tiffaney Allen sent an email with a "shout out" to Relator for meeting her daily productivity goals.

127.   Charts circulated within Defendant showed that Relator was one of Defendant's best performing employees.

128.   Once Relator complained about the fraudulent practices to her supervisors, Defendant's treatment of her changed and Defendant began retaliating against her. First the retaliation took the form of forcing her to work on holidays, denying her time off to take her son to the doctor when he was ill, improperly adjusting her accrued paid time off, improperly making her ineligible for bonuses, and giving her written warnings for having a bad attitude and taking time off to take her son to the doctor.

129.   Defendant consistently punished Relator, treating her more unfavorably than Relator's co-workers who went along with the fraud. Eventually, Defendant retaliated against her by terminating her employment in May 2018.

130.   Relator engaged in protected activity when she investigated and reported the fraudulent nature of Defendant's schemes.

131.   Specifically, Relator opposed Defendant's practices described above. Her opposition was memorialized in Relator's emails to her supervisors (including Hannosh, Samz and Crystal Thudium), as well as emails from her supervisors acknowledging her opposition (including the 10/23/2017 emails.)

132.   Relator's actions were motivated by her good faith belief that Defendant was committing fraud against the United States and Texas.

133.    Defendant was on notice that Relator was investigating the fraud as evidenced by Relator's multiple conversations and emails with Hannosh, Samz, Trielstad, and Thudium wherein Relator complained about these fraudulent practices. These conversations put Defendant on notice that litigation was a reasonable possibility.

134.    Defendant's harassment and eventual termination of Relator was motivated by her protected activity described in this pleading.  Her harassment and eventual termination happened directly after the protected activity and her protected activity is the cause of her harassment, unfair treatment and eventual termination, as she was otherwise recognized as doing an excellent job.

135.    Defendant's retaliation and discrimination inflicted damages on Relator including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, emotional distress, litigation costs.

## XIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

136.    Relator re-alleges and incorporates by reference the allegations in this pleading.

137.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the Government for payment or approval, as follows:

27

138.    As described above, Defendant submitted false claims to the Government, in violation of applicable statutes, regulations and rules, and in violation of Defendant's agreement to comply with these statutes and rules.

139.    The Government paid the false claims described herein.

140.    Defendant's fraudulent actions, as described in this Complaint, are part of a widespread, systemic pattern and practice throughout Defendant's company of knowingly submitting or causing to be submitted false claims to the United States.

141.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United States through Medicare and Medicaid for such false or fraudulent claims, and in the higher amounts paid to MCOs and MAOs by the United States as a result of the fraudulent claims submitted.

142.    As alleged above, Defendant submitted claims for payment to the Government based on fabricated, incomplete, expired and/or non-existent certificates of medical necessity; falsely certified that diagnosis and other medical information on claims for payment was provided by a patient's physician rather than by Defendant; and billed for amounts of product beyond the amounts approved by physicians or other medical personnel.

143.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented to the United States false or fraudulent claims to the Government for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, Defendant knowingly made or presented, or caused to be made or presented, to the United States claims for payment for the equipment and products provided by Defendant to Defendant's customers who were covered by Medicare, Medicaid, TRICARE, and MCO, and MAO, or other Government-funded program.

144.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

## SECOND CAUSE OF ACTION

### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

145.    Relator re-alleges and incorporates by reference all paragraphs in this pleading.

146.    By virtue of the acts described above, Defendant knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B); that is, Defendant knowingly made or used or caused to be made or used false Medicare claim forms and supporting materials, such as internal billing forms, certificates of medical necessity, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicare claims paid or approved by the United States for Defendant's customers supplied with products by Defendant.

147.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act

29

of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

**THIRD CAUSE OF ACTION**

**Texas Medicaid Fraud Prevention Act,**
**TEX. HUM. RES. CODE §§36.001, *et seq.***

148.    All allegations in this Complaint are incorporated herein by reference.

149.    Relator brings this Qui Tam action on behalf the Texas Government to recover treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act ("TMFPA"), TEX. HUM. RES. CODE §§36.001, *et seq.*

150.    Relator seeks damages and civil penalties from Defendant for numerous TMFPA violations, including, inter alia, knowingly making a false statement or misrepresentation of a material fact to Texas, concealing information from the Texas Medicaid program, and false and fraudulent billing for medical services requiring a state license when those services were in fact performed by unlicensed personnel.

151.    Defendant's conduct that constituted TMFPA violations includes, but is not limited to: 1) having Defendant's employees fill out sections of CMN and PAR forms that were required to be completed by a physician or clinician; and 2) billing for quantities of products beyond those prescribed; 3) knowingly submitting claims for payment without the required supporting documentation; 4) submitting claims for payment using information of persons other than the customer being provided products and supplies; and 5) submitting claims for payment with false information designed to keep from raising red flags.

30

152.    Defendant's fraudulent misconduct increased Defendant's profits at the expense of the Texas Medicaid program.

153.    A comparison of the CMNs, PARs, prescriptions, with the other information in customer files will reveal Defendant's fraud.

154.    Defendant, therefore, knowingly violated the terms and conditions of its Provider Agreement and Provider Manual with Texas Medicaid and violated provisions of the TMFPA.

155.    As a condition for participating as Medicaid Providers in Texas Medicaid, Defendant was required to disclose and not conceal material facts when claiming payment from Texas Medicaid. Defendant was further required to comply with all state laws and provide and maintain quality services to Texas Medicaid patients within accepted medical community standards and standards required by statute or regulation.

156.    From 2015 through 2018, Defendant failed to disclose to Texas Medicaid that Defendant had made false statements to Texas to allow it to continue treating Texas Medicaid patients.

157.    Defendant, therefore, knowingly and/or intentionally concealed or failed to disclose an event or information, so as to receive a benefit or payment under the Texas Medicaid program, all of which conduct violated the terms and conditions of its Provider Agreement and Provider Manual with Texas Medicaid and violated provisions of the TMFPA.

158.    As described above, Defendant committed unlawful acts in violation of the TMFPA, by: knowingly or intentionally concealing or failing to disclose an event that Defendant knew would affect their initial or continued right to a benefit or payment under the Medicaid program.

31

159.    Specifically, Defendant failed to disclose that it was fabricating information in its submissions to Medicaid, filling out sections of forms that were required to be completed by physicians, and providing false information in its claims in order to get them approved. This conduct violates TMFPA § 36.002(2).

160.    Defendant committed unlawful acts in violation of the TMFPA, by: knowingly making or causing to be made a false statement or misrepresentation of a material fact that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized.

161.    Specifically, Defendant knowingly made or caused to be made a false statement regarding the amounts of product prescribed by physicians, and otherwise as described above. This conduct violates TMFPA §36.002(1).

162.    Defendants knowingly concealed and failed to disclose information that permitted Defendant to receive a benefit or payment under the Texas Medicaid program that was not authorized in violation of TMFPA § 36.002(2).

163.    Under the TMFPA, Defendant is liable to Texas for the amount of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts, plus interest from the date of the payment, two times the amount of the payment, and a civil penalty for each unlawful act committed, in addition to the fees, expenses, and costs of investigating and obtaining civil remedies in this matter. TEX. HUM. RES. CODE ANN. §§ 36.052, 36.007, 36.110(c).

164.    Relator invokes in the broadest sense all relief possible under § 36.052, whether specified in this pleading or not. Relator will seek an amount as civil penalties that will be justified and appropriate under the facts and the law.

165.     The TMFPA is a statute of absolute liability. There are no statutory, equitable, or common law defenses for any violation of its provisions. Further, Texas jurisprudence provides that the defenses of estoppel, laches, and limitations are not available against the State of Texas, as a Sovereign. *State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993).

166.     Pursuant to TEX. HUM. RES. CODE §§36.052, Defendant is liable for the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party; interest; a civil penalty in the range set forth by the False Claims Act, as set forth above, and (for elderly, disabled and persons under 18) in the range of $5,500 to $15,000 (as adjusted under law), and two times the amount of the payment or the value of the benefit described above.

## FOURTH CAUSE OF ACTION

### Retaliation – False Claims Act, 31 U.S.C. § 3730(h)

167.     Relator re-alleges and incorporates by reference all paragraphs in this pleading.

168.     Relator engaged in protected activity when she investigated and reported the fraudulent nature of Defendant's schemes.

169.     Specifically, Relator opposed Defendant's practice of fraudulently billing for products Defendant provided to its customers and fraudulently representing information regarding its customers as described above.

170.     Relator's actions were aimed at matters that reasonably could lead to a viable claim under the FCA and/or demonstrated a distinct possibility of FCA litigation.

171.     Relator's actions were motivated by her good faith belief that Defendant was committing fraud against the United States.

33

172.    Relator put Defendant on notice that Relator was investigating the fraud as evidenced by the multiple conversations and email exchanges wherein Relator complained about these fraudulent charges and resisted participating in them. These conversations put Defendant on notice that litigation was a reasonable possibility.

173.    Defendant first retaliated against Relator by forcing her to work on holidays, denying her time off to take her son to the doctor when he was ill, improperly adjusting her accrued paid time off, improperly making her ineligible for bonuses, and giving her written warnings for having a bad attitude and taking time off to take her son to the doctor.

174.    Defendant consistently punished Relator, treating her more unfavorably that Relator's co-workers who went along with the fraud. Eventually, Defendant retaliated against her by terminating her employment in May 2018.

175.    These acts were all in retaliation for protected activities including investigating and opposing fraudulent practices by Defendant in violation of the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h).

176.    Defendant's harassment and eventual termination of Relator was motivated by her protected activity described in this pleading.  Her harassment and eventual termination happened directly after the protected activity and her protected activity is the only possible cause of her harassment and eventual termination, as she was otherwise recognized as doing an excellent job.

177.    Defendant's retaliation and discrimination inflicted damages on Relator including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, emotional distress, litigation costs and attorneys' fees, all collectively in an amount to be determined at trial.

34

178.    Pursuant to 31 USC §3730(h)(2), Relator is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Retaliation – TMFPA, TEX. HUM. RES. CODE §§36.115

179.    Relator re-alleges and incorporates by reference all paragraphs in this pleading.

180.    As alleged above, Relator engaged in protected activity when she investigated and reported the fraudulent nature of Defendant's schemes.

181.    The TMFPA provides that an employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of a lawful act taken by the person or associated others in furtherance of a TMFPA action, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this subchapter, or other efforts taken by the person to stop one or more violations of the TMFPA is entitled to: (1) reinstatement with the same seniority status the person would have had but for the discrimination; and (2) not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees. TEX. HUM. RES. CODE §§36.115(a).

35

182.    Defendant's actions, described above, that violated the FCA's retaliation provision also violated the TMFPA's retaliation provision.

## PRAYER

WHEREFORE, Relator prays for the following relief:

1.      A permanent injunction requiring Defendant to cease and desist from violating the federal FCA;

2.      Under the FCA, Judgment if favor of the United States against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendant's unlawful conduct;

3.      Civil monetary penalties payable to the United States for each false and fraudulent claim submitted to the United States by Defendant, as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015.)

4.      The maximum relator's share allowed pursuant to 31 U.S.C. §3730(d).

5.      An award to Relator pursuant to 31 U.S.C. §3730(d) of reasonable attorneys' fees, costs, and expenses;

6.      Under the TMFPA, Judgment in favor of the State of Texas against Defendant in an amount equal to three times the amount of all payments made from the Texas Medicaid program either directly to Defendant, or to an MCO or MAO for any of Defendant's customers;

7.      A civil penalty payable to the State of Texas of not less than $5,500 and not more than $11,000 (or $15,000 for elderly, disabled and minors), as adjusted by law, for each false

36

claim Defendant presented or caused to be presented resulting in payment from the State of Texas to Defendant or to an MCO or MAO for any of Defendant's patients;

8.      The maximum relator's share allowed pursuant to TEX. HUM. RES. CODE §36.110 and/or any other applicable provision of law;

9.      An award to Relator pursuant to TEX. HUM. RES. CODE §36.110 of reasonable attorneys' fees, costs, and expenses;

10.     As to the 31 U.S.C. §3730(h) retaliation claim, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial;

11.     As to the TEX. HUM. RES. CODE §§36.115 retaliation claim, not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial;

12.     Prejudgment interest;

13.     All costs incurred in bringing this action;

37

14.    Such other relief as the Court deems just and equitable.


## XIV.    JURY DEMAND

Relator hereby demands a jury trial on all issues triable to a jury.



Dated:  August 6, 2018.



By:    /s/ Cory S. Fein
       Cory S. Fein
       Cory Fein Law Firm
       712 Main St., Suite 800
       Houston, TX  77002
       cory@coryfeinlaw.com
       (281) 254-7717 (phone)
       (530) 748-0601 (fax)


**ATTORNEY FOR RELATOR**